# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| HILDEGARD RAMUSACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:04-CV-226  PS |
| | ) | |
| JOSEPH W. SWANSON, Individually | ) | |
| and in his official capacity as a member | ) | |
| of the Crown Point Police Department; | ) | |
| PETE LAND, City of Crown Point | ) | |
| Chief of Police; CROWN POINT | ) | |
| POLICE DEPARTMENT; and the | ) | |
| CITY OF CROWN POINT, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Hildegard Ramusack brought this action against Officer Joseph W. Swanson, City of Crown Point Chief of Police Pete Land, Crown Point Police Department, and the City of Crown Point, claiming that Swanson used excessive force during an arrest on May 23, 2003. Plaintiff has alleged that Defendants are liable pursuant to 42 U.S.C. § 1983 for violating her Fourth, Sixth, Eight, and Fourteenth Amendment rights under the United States Constitution and under Indiana law for assault and battery. The issues presented are whether Swanson's use of force was excessive under the circumstances, whether Swanson is entitled to qualified immunity and whether Land, the Crown Point Police Department or the City can be held liable for Swanson's actions. For the reasons stated below, the Defendants' Motion for Summary Judgment [Doc. 13] is granted in part and denied in part.

## I.  FACTUAL BACKGROUND

Although Plaintiff Ramusack and Defendant Swanson agree on some events, they differ on certain issues of material fact. The Court will note where the parties disagree. On March 16, 2003, Ramusack, while driving, hit a parked vehicle.[1] (Pl. Dep. 67:25-68:5.) Swanson investigated the incident. (Def. Aff. ¶¶ 4-6.) During Swanson's investigation, Ramusack's husband arrived on the scene. (*Id.* ¶ 7.) The husband admitted that he was upset, but according to him, did not voice the fact that he was upset and did not touch Swanson. (G. Ramusack Dep. 6:9-12, 9:6-8, 12-14.) Ramusack also testified that she did not think her husband was argumentative with Swanson. (Pl. Dep. 74:5-7.) Swanson, on the other hand, stated that Ramusack's husband was visibly upset, verbally abusive, and pushed Swanson on two separate occasions during the investigation. (Def. Aff. ¶ 7.) Swanson considered arresting Ramusack's husband for battery but decided not to do so "given Mr. Ramusack's age, lack of prior contacts with Swanson and what Swanson perceived to be concern for Plaintiff albeit a misdirected way of expressing it." (Defs.' Statement of Material Facts 2; Def. Aff. ¶ 8.) Swanson arrested Ramusack for operating a vehicle while intoxicated (OWI) and released her on her own recognizance. (Def. Aff. ¶¶ 10, 11.)

Ramusack was given notice to appear at the Crown Point City Court on April 1, 2003. (Def. Aff. ¶ 11; Pl.'s Resp. to Interr. 4.) Ramusack contacted Attorney Michael L. Deppe to represent her at that hearing. (Pl.'s Resp. to Interr. 4.) Deppe entered his appearance and waived the initial hearing, but was never informed of the next hearing set for May 13, 2003. (*Id.*;

---

[1] The Court recounts Plaintiff's version of the facts as it must construe all facts and reasonable inferences from the record in the light most favorable to the non-moving party when making a summary judgment determination. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

(Criminal Chronological Case Summary, Cause No. 45H01-0303-CM-598.)  Judge Herman Barber, presiding over the criminal case, issued a bench warrant because neither the attorney nor Ramusack appeared for the hearing on May 13, 2003.  (Criminal Chronological Case Summary, Cause No. 45H01-0303-CM-598.)  The arrest warrant was signed on May 20, 2003.[2]  (*See* Bench Warrant.)

On May 23, 2003 at approximately 1:00 P.M., Swanson and Officer Mile Knezevic arrived at Ramusack's residence to serve the warrant.  (Def. Aff. ¶ 16; Pl.'s Resp. to Interr. 4.)  The officers knocked on the door, and Ramusack, who was barefoot and wearing cut-off shorts, answered.  (Pl. Dep. 4:17-5:9, 12:15-17.)  Ramusack was nearly 62 years old, is 5'6" tall, and weighs about 136 pounds.  (*Id.* 3:11-12, 22:8-12.)  Swanson identified himself and explained that they were there to arrest Ramusack on a misdemeanor arrest warrant for failing to appear for her OWI charges.  (Pl. Dep. 8:8-17; Pl.'s Resp. to Interr. 4.)  According to Ramusack, she called for her husband, who appeared at the top of the stairs and began coming down.  (Pl.'s Dep. 8:18-9:12.)  Swanson held up the warrant.  (*Id.*)  Ramusack's husband asked to see the warrant, but Swanson refused and told Ramusack's husband not to come downstairs.  (*Id.*)  The husband remained upstairs.  (*Id.*)  Ramusack also testified that her husband did not raise his voice or swear at the officers although he stated, "You can't do that to my wife."[3]  (*Id.* 20:15-21:9.)

---

[2]  On May 27, 2003, the Crown Point City Court noted that neither Deppe nor Ramusack was given notice of the May hearing date.  (Criminal Chronological Case Summary, Cause No. 45H01-0303-CM-598.)  The charge of failure to appear was dismissed, and the bond for the charge was returned.  (*Id.*)

[3]  Swanson's version differs: after Ramusack called for her husband, Swanson explained to him why the officers were present and showed him the warrant.  (Def. Aff. ¶ 25.)  But Ramusack's husband was not interested in any explanation and begin to yell at the officers.  (*Id.*)  Swanson nevertheless read the warrant, but Ramusack's husband continued to shout and came

3

Swanson did note that Ramusack's husband was an "older gentleman" who couldn't move too fast. (Def. Dep. 103:20-104:3.) Swanson is 6' tall and weighs 285 pounds, and Knezevic is 6'2" tall and weighs 190 pounds. (*Id.* 3:1-4, 82:3-4.)

Surprised by Swanson's claim that he had an arrest warrant, Ramusack told the officers that "[i]t can't be true. Has to be a mistake[,]" and asked Swanson for permission to call her attorney. (Pl. Dep. 8:15-17, 10:14-17.) According to Ramusack, she was not permitted to review the warrant despite requesting to do so. (*Id.* 9:15-19, 10:17-20, 11:1-14.) Swanson only held up a piece of paper and represented that it was a warrant signed by Judge Barber. (*Id.* 9:20-25.) Contrary to Ramusack's assertions, Swanson stated that he showed Ramusack the warrant and gave her an opportunity to read the warrant, which she disregarded. (Def. Aff. ¶ 20.)

Swanson asked Ramusack to step outside. (Pl. Dep. 13:3-5.) When Ramusack questioned the reason, Swanson told Ramusack that it was police procedure. (*Id.* 13:6-8.) Ramusack then asked Swanson for permission to go the bathroom. (*Id.* 13:9-13.) Swanson refused. (*Id.*) Ramusack again expressed her wish to call her attorney and that there must be a mistake. (*Id.* 13:16-21.) Swanson replied that he was following police procedures, which he repeated several times during the course of their interaction. (*Id.* 14:7-11.) Ramusack told Swanson that she would come with them and also asked for permission to get her shoes and go to the bathroom. (*Id.* 14:24-15:1.) Swanson again refused. (*Id.* 15:1-3.) Ramusack turned around and was getting ready to put her foot on the stairs, saying that she was going to get her

---

down the stairs. (*Id.* ¶¶ 25-27.) Swanson ordered him to stop on the stairs and not come any closer. (*Id.* ¶ 28.) But Ramusack's husband continued to move toward the officers, who told him that if he moved any closer and interfered with his wife's arrest he would be arrested. (*Id.* ¶ 29.) The husband stopped a few feet from the officers. (*Id.*) Because of the husband's behavior, Knezevic told Swanson that they must leave the house immediately. (Knezevic Aff. ¶ 13.)

4

shoes.[4]  (*Id.* 15:3-4, 17:10-14; Pl.'s Resp. to Interr. 4.)  Swanson, in his affidavit, stated that Ramusack repeatedly tried to move away from the officers and refused to go with them.  (Def. Aff. ¶¶ 20, 21, 32.)  But Ramusack only admitted to moving away once when she attempted to get her shoes and claimed that she told the officers that she was going with them.  Accordingly, Ramusack claims that she was not attempting to resist arrest or flee (Pl.'s Resp. to Interrs. 4, 25), while Swanson argues that Ramusack was not cooperating with the officers (Def. Aff. ¶ 23). Nevertheless, Swanson testified that he did not perceive Ramusack as a physical threat to himself or Knezevic.  (Def. Dep. 91:11-19.)  Swanson also stated that Ramusack was not abusive to the officers.  (*Id.* 108:24-109:3.)

At the point when Ramusack turned to go up the stairs, Ramusack stated that Swanson repeated that she could not go upstairs and put one foot inside the home and grabbed Ramusack's arm.  (Pl. Dep. 14:24-15:9, 17:17-25.)  Ramusack was hanging onto the bannister. (*Id.*)  Swanson jerked Ramusack off the bannister (*id.*), and then turned one of Ramusack's arms around and put it behind her back and did the same with the other arm (*id.*; Pl.'s Resp. to Interr. 4).  Swanson pulled her hand high between her shoulder blades.  (Pl.'s Resp. to Interr. 4.)  At some point during this interaction, Swanson took Ramusack outside.  (Pl. Dep. 17:25.) Ramusack told Swanson that he was hurting her and that he didn't need to put handcuffs on as she was coming with him.  (*Id.* 16:18-25; Pl.'s Resp. to Interr. 4.)  Swanson replied that handcuffing was police procedure, and handcuffed her.[5]  (Pl. Dep. 17:1-5; Pl.'s Resp. to Interr.

---

[4]  Ramusack offered to have an officer come with her while she went to the bathroom. (Pl. Dep. 25:14-20.)

[5]  Ramusack claims that it is a reasonable inference that Swanson failed to double-lock the handcuffs because the handcuffs continued to tighten as she wore them.  (Pl.'s Statement of

4.)  Swanson pulled Ramusack's arms up while she was handcuffed.  (Pl.'s Resp. to Interr. 4.)

Ramusack asked Swanson to not pull her arms up any higher as he was hurting her and to loosen

the handcuffs.  (*Id.*)  Swanson replied that the handcuffs were not made for comfort.  (*Id.*)

Swanson and Knezevic each took one of Ramusack's arms and continued to force her

handcuffed arms up high behind her back.  (*Id.*)  Swanson testified that he knew that lifting up

Ramusack's arms while handcuffed in the back would cause her pain.  (Def. Dep. 35:22-36:2.)

Ramusack had black and blue marks where Swanson held her arm.  (Pl. Dep. 21:19-22:2.)  The

officers almost lifted Ramusack and dragged her barefoot to the squad car along the sidewalk.

(*Id.* 23:4-10.)  When Ramusack asked Swanson why he was doing this, Swanson responded that

it was police procedure or policy.  (*Id.* 24:9-15.)  Ramusack answered that Swanson did not have

to handcuff her and make them so tight.  (*Id.* 24:16-17.)  According to Ramusack, her husband

did not leave the house from the handcuffing until Ramusack was in the police car.  (*Id.* 24:18-

22.)[6]

Swanson's version of the above events is different:  He stated that he secured Ramusack

by the arm (elbow area), and both officers escorted Ramusack outside.  (Def. Aff. ¶¶ 33, 34.)

Ramusack walked on her own with her arms at her side.  (*Id.* ¶ 34.)  Once outside, Swanson

asked Ramusack to place her hands behind her back, and Ramusack complied.  (*Id.* ¶ 36.)  When

Swanson attempted to handcuff her, Ramusack moved slightly forward.  (Def. Dep. 102:9-

---

Genuine Issues 7-8.)  An officer double-locks handcuffs to prevent tightening and consequently,
injury or pain.  (Def. Dep. 9:3-7, 11:7-11.)

[6] Swanson, on the other hand, testified that Ramusack's husband left the home and was
yelling or talking while the officers were escorting Ramusack to their car.  (Def. Dep. 104:6-13,
109:11-13.)  Knezevic spoke to the husband, and Swanson continued to walk with Ramusack.
(*Id.* 104:14-20, 109:13-17.)

103:12.)  Ramusack then permitted Swanson to handcuff her.  (Def. Aff. ¶ 36.)  Swanson

admitted that Ramusack was not physically fighting with him, struggling or trying to run away.

(Def. Dep. 102:9-103:12.)  Swanson checked the spacing between her wrists to ensure they were

not too tight and double-locked the handcuffs to prevent tightening during transport to the jail.

(Def. Aff. ¶ 36.)  Swanson escorted Ramusack, who walked on her own to his car.  (*Id.* ¶ 37.)

Once in the police car, Ramusack began crying and continued to complain about the tight

handcuffs, asking Swanson to loosen them.  (Pl. Dep. 27:9-14.)  Ramusack's wrists were red and

cut from the handcuffs.  (*Id.* 27:14-15.)  Swanson pulled over and loosened the handcuffs.  (*Id.*

27:15-18.)  But Ramusack complained that the handcuffs were just as tight as before.  (*Id.* 27:18-

20.)  As a consequence of this incident, Ramusack injured her arm, shoulder and wrist.[7]  (*Id.*

41:3-8.)  Ramusack sought medical attention for her shoulder pain and has undergone physical

therapy.  (Pl.'s Resp to Interr. 5.)  She continues to experience shoulder pain.[8]  (*Id.*)

---

[7]  Again, Swanson's version of these events are somewhat different: Once Ramusack
began to complain about the handcuffs in the car, Swanson asked her if the cuffs needed to be re-
adjusted.  (Def. Aff. ¶ 38.)  Ramusack said no, and they left Ramusack's residence.  (*Id.*)  While
traveling to the jail, Ramusack again complained that the handcuffs were hurting her wrists.  (*Id.*
¶ 39.)  To help ease her pain, Swanson pulled his police car into the Crown Point Community
School Corporation front drive, parked the car, exited the car, and let Ramusack out of the car.
(*Id.* ¶ 40.)  Swanson checked the handcuffs, removed the cuffs, re-positioned them as it appeared
that Ramusack had turned her wrists, and double-locked them.  (*Id.*)

[8]  In their Reply Brief in Support of their Motion for Summary Judgment, Defendants
frequently remark that certain favorable facts to Defendants are "undisputed."  The Court
however finds that the record, at best, is unclear on some "undisputed" facts, and that some such
facts are clearly in dispute.

## II.  DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party."  *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

### B.      The Excessive Force Claim

Ramusack filed this lawsuit pursuant to Title 42, United States Code, Section 1983 alleging that her Fourth Amendment right to be free from unreasonable seizures was violated through the excessive use of force.  To prevail on her § 1983 claim, Ramusack must prove two elements: "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the activity deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003). The first element is not in dispute.  (*See* Pl. Compl. ¶ 15; Defs.' Answer ¶ 15.)

"[T]he Fourth Amendment prohibits the use of excessive force during the execution of a seizure."  *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000).  To determine whether the amount of force used during a seizure is excessive, the Court must determine whether the police officer's actions were "'objectively reasonable' in light of the facts and circumstances

8

confronting them[.]" *Graham v. Connor*, 490 U.S. 386, 397 (1989).  The amount of permissible force will depend upon the specific facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Jacobs*, 215 F.3d at 773 ("In the end, the excessive force inquiry 'looks to whether the force used to seize the suspect was excessive in relation to the danger he posed -- to the community or to the arresting officers -- if left unattended.'") (citation omitted).  A police officer's use of force is unconstitutional "if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chicago,* 830 F.2d 706, 713 (7th Cir. 1987).  Nevertheless, the Court must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Thus, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

As discussed above, the Court must examine the totality of the circumstances, including the four factors laid out in *Graham*.  First, Ramusack's crime of not appearing for a hearing was a minor offense based on a misdemeanor warrant.

Second, Ramusack did not pose an immediate threat to the safety of the officers or others. She was unarmed, and the officers never searched her for a weapon.  The officers also never searched or secured her husband.  Swanson even admitted that he was not afraid of Ramusack.

Third, Ramusack was not actively resisting arrest.  Swanson claimed that Ramusack

9

leaned slightly forward when he attempted to handcuff her, but Ramusack does not admit to that assertion. Moreover, Swanson acknowledges that Ramusack did not struggle or physically fight him when he placed the handcuffs on her. According to Ramusack's version of events, there is no evidence that she resisted arrest.

Fourth, Ramusack was not attempting to evade arrest by flight. According to Ramusack, she stated to the officers that she would go with them, but she first wanted to go to the bathroom and put on her shoes. When she turned away from the officers, she was attempting to only get her shoes – not to evade arrest. In their Brief in Support of Summary Judgment, Defendants assert that Ramusack was fleeing or attempting to evade arrest. (Defs.' Brief Supp. Summ. J. 4, 5.) This is a stretch considering Ramusack told the officers that they could accompany her upstairs. It is true that Ramusack disregarded Swanson' order not to go upstairs. However, under the totality of the circumstances and looking at the facts in a favorable light to Ramusack, it was not reasonable for the officers to think that she was evading arrest or presenting a risk of escape, particularly as she told Swanson she would come with them. Moreover, despite Ramusack's alleged lack of cooperation from the officers' viewpoint (*i.e.*, challenging the arrest warrant – which as it turned out, was a legitimate challenge, and wanting to go to the bathroom and to get her shoes), the officers appeared to maintain control over the situation.

This Court also may consider other factors in determining whether excessive force was used in these circumstances. For example, Ramusack was an elderly (62 years old), slim (5'6" tall and 136 pounds) woman who, according to her testimony, did not cause the officers to fear for their safety or actively resist arrest. *See, e.g., Hyatt v. Indianapolis Police Dep't*, No. 103CV0424, 2004 WL 1784857, at *6 (S.D. Ind. July 20, 2004) (noting that "[a] reasonable jury

10

could find that it was excessive for the police to force an elderly man to the ground who was not resisting arrest in any way, and who had not done anything to justify an arrest").  Also, although Swanson and Knezevic claim to have feared for their safety from Ramusack's husband, Swanson also testified that the husband was "older" and couldn't move too fast.  The jury will have to sort out whether there is any discrepancy between this testimony and decide which story (Ramusack's or the officers') to believe.  Therefore, Ramusack's age and size, along with the material dispute of whether the husband was threatening the officers' safety, favor denying summary judgment.

In this case there are several genuine issues of material fact that must be decided by the factfinder.  The issues include: (1) whether the husband behaved in a threatening manner to the officers; (2) whether Ramusack repeatedly disobeyed orders given by Swanson and refused to go with the officers; (3) whether Swanson yanked Ramusack off the bannister and jerked her arms up; (4) whether the officers dragged Ramusack to their car; and (5) whether Ramusack resisted being handcuffed.  All these facts are material to a determination of whether or not Swanson used excessive force in arresting Ramusack.

Defendants cite several cases to demonstrate that Swanson's use of force was not excessive.  But these cases are inapposite to the factual scenario (in the best light to Plaintiff Ramusack) presented here.  *See, e.g., Jones ex rel. Jones v. Webb*, 45 F.3d 178, 184 (7th Cir. 1995) (finding no excessive force where plaintiff is struggling and refuses to leave a private residence voluntarily); *Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001) (holding that reasonable officer may have thought plaintiff was trying to flee when plaintiff in car did not pull over for twelve blocks in spite of police playing siren); *Bringle v. State*, 745 N.E.2d 821, 827

11

(Ind. Ct. App. 2001) (reviewing list of acts of plaintiff's resistance while being arrested); *Saucier*, 533 U.S. at 198, 208 (noting that "it is doubtful that the force used was excessive" where plaintiff was "half-walked , half-dragged" to a van and thrown inside but no force regarding handcuffs was used); *Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003) (cursory holding that excessive force claim has no merit with no factual scenario presented regarding such claim); *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004) (no excessive force used when plaintiff was combative and irrationally angry and whose actions may be seen by a reasonable police officer as attempting to evade arrest and posing a danger to pedestrians); *Trout v. Frega*, 926 F. Supp. 117, 120, 122 (N.D. Ill. 1996) (finding of no excessive force where plaintiff was larger (4 inches taller and 100 pounds heavier) than police officer, police officer knew about prior domestic disturbance regarding plaintiff, and handcuffing was only force used against plaintiff).

### C.  Qualified Immunity

Defendants argue that even if there are questions of fact regarding whether the force used by Swanson was reasonable under the circumstances, Swanson is entitled to the protection of qualified immunity.  Police officers are entitled to qualified immunity for their official actions if they could have reasonably believed that their conduct was lawful in light of clearly established law.  *See Anderson v.  Creighton*, 483 U.S. 635, 641 (1987).  Therefore, even if an officer unreasonably used force and therefore violated the Fourth Amendment, qualified immunity applies if the officer had a reasonable, albeit erroneous, belief about the legality of his actions.  *See Saucier*, 533 U.S. at 205 ("An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those

circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (holding that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

To assess whether qualified immunity applies, this Court must undertake a two-step process. *See Saucier*, 533 U.S. at 200. First, the Court must determine whether, taken in the light most favorable to Ramusack, the facts alleged show that Swanson's conduct violated a constitutional right. *Id.* at 201. If no constitutional right was violated, then "there is no necessity for further inquiries concerning qualified immunity." *Id.* But as already reviewed in the above section (IIB), this Court holds that Swanson's use of force, based on Plaintiff Ramusack's version of the facts, was unlawful.

Second, when the facts alleged reveal a constitutional violation, as they do here, then "the next, sequential step is to ask whether the right was clearly established." *Id.* A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Here, Defendants claim that, even if the facts were to establish a constitutional violation, it was not clearly established as of May 2003 that Swanson's use of force was constitutionally impermissible behavior under the Fourth Amendment. Specifically, Defendants argue that Ramusack has not provided any pre-May 2003 case law establishing that Swanson's behavior constituted excessive force. (Defs.' Reply Br. Supp. Summ. J. 9-10.) It is true that Ramusack has the burden "to demonstrate that a constitutional right is clearly established." *Jacobs*, 215 F.3d at 766. This requires Ramusack to offer a "clearly analogous case establishing a right to be

13

free from the specific conduct at issue" or to allege that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." [9] *Smith*, 242 F.3d at 742. "Although it is not necessary that a prior case address the precise factual situation confronting the officer, the unlawfulness of the officer's action should be clear in light of pre-existing law." *Jones ex rel. Jones*, 45 F.3d at 183; *see also Saucier*, 533 U.S. at 202-03 ("Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.").

Ramusack relies on *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), which was decided after May 2003. Therefore, this case cannot be offered as a closely analogous case to show that the officers should have known that their behavior was unconstitutional. Nevertheless, Ramusack may rely on cases cited by the *Payne* Court when coming to its decision. *Id.* at 779-780. For example, in *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002), the Seventh Circuit found that officers used excessive force where "without provocation or excuse [defendant] shoved the middle-aged female plaintiff to the ground and [the other defendant] refused to loosen the plaintiff's chafing handcuffs[.]" Plaintiff had not resisted arrest or fled from defendants. *See id.* at 1042-43. In this case, Swanson jerked Ramusack, who testified that she was not resisting arrest or fleeing, off the bannister with unnecessary force, handcuffed her wrists tightly, and jerked her hands up behind her head repeatedly even though she was well

---

[9] Ramusack does not contend that Swanson's conduct was so egregious that no reasonable person could have believed that it did not violate clearly established rights.

14

secured.  Even though Swanson claims to have double-locked the handcuffs after Ramusack's complaints, the handcuffs remained just as tight.  *See also, e.g., Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002) (holding that whether police used excessive force was issue for jury, where defendant forced plaintiff against truck, twisted arm and raised it high behind back, where handcuffs were so tight they caused injury to wrist, and where plaintiff had committed no offense, posed no safety risk, and made no resistance); *Kostrzewa v. City of Troy*, 247 F.3d 633, 640-41 (6th Cir. 2001) (refusing to dismiss excessive force claim where plaintiff was arrested for taking an illegal left-hand turn and handcuffing made wrists swollen, red and painful); *Tennen v. Shier*, No. 94 C 2127, 1995 WL 398991, at *7 (N.D. Ill. June 30, 1995) (denying summary judgment where defendant grabbed and yanked plaintiff's arm, where plaintiff did not offer any resistance).

The Court has also found a closely analogous case that was decided before Ramusack's arrest.  *DuFour-Dowell v. Cogger,* 969 F. Supp. 1107 (N.D. Ill. 1997), dealt with circumstances similar to this case.  There, police officers attempted to execute a misdemeanor arrest warrant for obstructing a police officer, but which did not involve any physical or violent conduct, on DuFour-Dowell at her residence.  *Id.* at 1115.  DuFour-Dowell answered the door barefoot and wearing a summer nightgown.  *Id.*  at 1116.  After being told that she was being arrested on a warrant, she said she wanted to change clothes and tell her family.  *Id.*  The officer said no, but the discussion was not yet confrontational.  *Id.*  At some point, a second officer told her it would be fine for her to change clothes, but that he would have to accompany her.  *Id.*  DuFour-Dowell said she would be "happy" to go with the officers after changing her clothes and telling her family.  *Id.*  The officer had still not shown DuFour-Dowell the arrest warrant.  *Id.*  She turned

and let the storm door close, at which point one of the officers stated, "Now you've had it, lady." *Id.* He grabbed her arm, gave her a hard jerk, and forced her face down on the floor with her arm behind her back and held her there for a few minutes. *Id.* Her glasses were broken by the fall, and she sustained a sore shoulder and back, an abrasion on her ankle, a bruise and gash on her arm, and chest soreness for a few weeks. *Id.*

The court noted that DuFour-Dowell was arrested on a misdemeanor charge, that she did not pose any direct threat to the officers despite prior information that there may have been a gun in the home, that her request to change clothes was reasonable and that the officers had no reason to believe that she would attempt to escape. *See id.* at 1119. The court therefore found that this police behavior was clearly excessive, and that a "police officer would know that it was." *Id.* at 1121.

Two differences between the factual scenarios in *DuFour-Dowell* and here are: (1) the officer forced DuFour-Dowell to the ground, while Swanson continued to jerk Ramusack's arms higher causing pain; and (2) a second officer gave permission to DuFour-Dowell to change her clothes, while Swanson refused to give permission to Ramusack. Nevertheless, this Court sees sufficient similarities to place Swanson on notice that his behavior violated Ramusack's constitutional rights.[10]

---

[10] *See also Hill v. Miller*, 878 F. Supp 114, 116 (N.D. Ill. 1995) (applying a Ninth Circuit holding that the court may not decide as a matter of law that qualified immunity applies because plaintiff's allegation that police officer pulled one hand up high behind plaintiff's back while handcuffing – where parties dispute whether plaintiff was resisting– may be excessive force) (citing *Meyers v. Nagel*, No. 90-35718, 1992 WL 92798, at *3 (9th Cir. April 30, 1992).); *Robison v. Via*, 821 F.2d 913, 923-24 (2d Cir. 1987) (holding that plaintiff's assertion that state trooper pushed plaintiff against inside of car door, yanked her out, threw her against fender and twisted her arm behind back is sufficient to prevent summary judgment on plaintiff's § 1983 claim for excessive force – despite plaintiff not seeking medical treatment); *Cooperstein v.*

Excessive and unnecessary use of force in May 2003 during an arrest where the arrestee does not resist or evade arrest violates clearly established constitutional rights of which a reasonable person would have known.  *See Hill v. Miller*, 878 F. Supp. 114, 116 (N.D. Ill. 1995) ("[I]t is well established that 'the use of any significant force . . . not reasonably necessary to effect an arrest -- as where the suspect neither resists nor flees or where the force is used after a suspect's resistance has been overcome or his flight thwarted - - would be constitutionally unreasonable.'") (citation omitted); *see also Payne v. Pauley*, 337 F.3d at 780 ("It was also well established that it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes.").  If the Court accepts Ramusack's version of events as true and draws all reasonable inferences in her favor – as it must do – Swanson's actions were not objectively reasonable and violated clearly established constitutional rights.

Looking at the totality of the circumstances and accepting Ramusack's version of facts as true, this Court holds that the evidence shows violations of clearly established law and therefore, qualified immunity does not apply.

### D.    Unlawful Arrest

---

*Procida*, No. 00 CV 2642, 2001 WL 715831, at *5 (E.D.N.Y. June 4, 2001) (finding that plaintiff's allegation – that state court security officers pushed her twice, grabbed her arm, twisted her arm behind her back which caused her to scream, dragged her and tightly handcuffed her –defeated summary judgment); *cf. Morales v. United States*, 961 F. Supp. 633, 637 (S.D.N.Y. 1997) (denying motion to dismiss plaintiff's claim of excessive force where plaintiff alleges that federal agents pulled plaintiff out of car, threw him against car and violently pulled arm behind back).

Ramusack does not appear to be making an unlawful arrest claim under the Fourth Amendment. She has cited no law to support this allegation, and it is unclear whether even her Complaint sets forth such a claim. Accordingly, summary judgment is granted on Ramusack's claim of unlawful arrest, to the extent it was even made. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) ("We have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues.") (quoting *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004)); *U.S. v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (quoting *Beard v. Whitley County REMC*, 840 F.2d 405, 408-09 (7th Cir.1988).)

E.     **Plaintiff Ramusack's Claims of Other Constitutional Violations**

In Plaintiff's Response to Defendants' Motion for Summary Judgment, Ramusack does not respond to Defendants' arguments regarding her claims of constitutional violations under the Sixth, Eight, and Fourteenth Amendments. In fact, Ramusack agrees with Defendants that her excessive force claim should be analyzed under the Fourth Amendment. (Pl.'s Resp. to Defs.' Mot. Summ. J. 3-4.) This Court therefore finds that Ramusack has waived her § 1983 claims under the Sixth, Eight and Fourteenth Amendments. *See Weinstein*, 422 F.3d at 477 n.1 ("The failure to develop an argument constitutes a waiver."). Accordingly, the Court grants summary judgment with respect to Ramusack's § 1983 claims under the Sixth, Eight and Fourteenth Amendments.

F.     **Municipal Liability Claims**

18

Defendants also assert that the Crown Point Police Department and the City of Crown Point are entitled to summary judgment on Ramusack's municipal liability claims. Municipal liability under § 1983 derives from *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), which ruled that local governments may be held liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690. The Supreme Court also held that local governments can be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91. To hold a municipality liable under § 1983, the plaintiff must show a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

A municipality cannot be held liable simply because it employs a tortfeasor. In other words, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. But there are ways in which a municipality can be liable for its employees' conduct if taken pursuant to the municipality's unconstitutional policy or custom. *See Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1999) "'Policy' or 'custom' can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.'" *Id.* at 571-72.

Of the three ways to prove municipal liability, Ramusack does not fulfill the

19

requirements necessary for surviving summary judgment on any of them.  First, Ramusack has

not pointed to any express municipal policy other than Swanson's alleged repeated refrain of "it

is policy" to handcuff arrestees.  Specifically, she argues that there is an express policy "to

brutally handcuff non resisting arrestees" without indicating what specific policy she is referring

to.  (Pl.'s Resp. to Defs.' Mot. Summ. J. 12.)  This is insufficient to show municipal liability as

Ramusack must identify a specific, unconstitutional policy – not simply point to statements made

by a police officer.  *Ienco v. City of Chicago*, 286 F.3d 994, 1001 (7th Cir. 2002) (affirming

grant of summary judgment in favor of city as plaintiff "introduced no material evidence at

summary judgment that [police officers] were acting pursuant to an official custom or policy of

[the city]."); *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000) (pointing to a specific,

official policy when reviewing plaintiff's municipal liability claim).  Ramusack's failure to point

to an official, express policy is sufficient to grant summary judgment on her municipal liability

claims.

Ramusack, in her Response, also does not provide evidence or attempt to argue that the

City of Crown Point maintains a widespread practice regarding her claim of excessive force or

that a constitutional injury was caused by a person with final policymaking authority.  Ramusack

does not include any allegations against Land as a final policymaking authority, or even refer to

Land in her Response.  Furthermore, she does not develop, or for that matter even mention, her

"failure to train" argument in her Response, which she had originally set forth in her Complaint.

(Compl. ¶¶ 23, 24.)  This Court will therefore not address these potential arguments that

Ramusack has now waived.  *See Weinstein*, 422 F.3d at 477 n.1 ("The failure to develop an

argument constitutes a waiver.").

Ramusack has pointed to no evidence that is sufficient to show that "the City deliberately deprived her of her rights." *Garrison*, 165 F.3d at 572. She has likewise pointed to no evidence regarding Land. Accordingly, Defendants' Motion for Summary Judgment is granted with respect to the City of Crown Point and Pete Land, City of Crown Point Chief of Police.

Ramusack also has sued Crown Point Police Department. However, "[a] city's police department is merely a vehicle through which the city government fulfills its policy functions and is not a proper party defendant." *Jones v. Bowman*, 694 F. Supp. 538, 544 (N.D. Ind. 1988). Therefore, Defendants' Motion for Summary Judgment is granted with respect to the Crown Point Police Department.

### G. State Law Claims of Assault and Battery

#### 1. State Law Claims against Swanson

Ramusack has sued Defendants under Indiana state law, alleging assault and battery. Swanson argues that he is personally immune from the state law claim by operation of the Indiana Tort Claims Act (ITCA), Ind. Code § 34-13-3-5 (2005). That Section states in pertinent part: "A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b). The Supreme Court of Indiana has definitively ruled as to the meaning of this sentence in the immunity statute in *Bushong v. Williamson*, 790 N.E.2d 467 (Ind. 2003). In *Bushong*, a school teacher was personally sued for battery. *Id.* at 472. In granting the teacher immunity from the suit, the Indiana Supreme Court stated that pursuant to Ind. Code § 34-13-3-5(a) (current version at Ind. Code § 34-13-3-5(b)) "a plaintiff may not now sue a governmental employee personally if the complaint, on its face, alleges that the employee's acts leading to the claim occurred within

the scope of employment." *Id*. at 471.  The Court further noted that "[t]he statute seems fairly explicit on this point." *Id*.  It is true that a governmental employee may be personally sued when a plaintiff alleges that the act or omission causing the loss is criminal.  *See* Ind. Code § 34-13-3-5(c)(1).  But "[e]ven criminal acts may be considered as being within the scope of employment if 'the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope.'" *Bushong*, 790 N.E.2d at 473.

In this case, it is undisputed that Swanson was acting within the scope of his employment when he arrested Ramusack.  (*See* Pl.'s Compl. ¶¶ 8, 15.)  Moreover, any allegations of Swanson's criminal acts are, as a matter of law, closely associated with his employment as a police officer.  *Bushong*, 790 N.E.2d at 473.  Thus, the Court finds that Swanson is afforded immunity under Ind. Code. § 34-13-3-5(b) for the state law claims of assault and battery.

### 2.   State Law Claims against City of Crown Point

The ITCA also renders immune from liability police officers in the course of their employment and their governmental employers if a loss results from "[t]he adoption and enforcement of or failure to adopt or enforce a law . . . , unless the act of enforcement constitutes false arrest or false imprisonment."  Ind Code § 34-13-3-3(8) (2005).  The statute is plain on its face that governmental entities can only be sued for law enforcement conduct involving false arrest and false imprisonment.[11]  *Id*.

Ramusack, however, cites to *Kemezy v. Peters*, 622 N.E. 2d 1296 (Ind. 1993), where the

---

[11]   The scope of the term "enforcement" is "limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof."  *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 283 (Ind. 1994).  Swanson's actions of effecting an arrest meet the Indiana Supreme Court's definition of "enforcement."

Indiana Supreme Court expanded the statute.  In that case, the Indiana Supreme Court held that excessive force is not conduct protected by the immunity statute.  *Id.* at 1297.  It explained that "law enforcement officers owe a private duty to refrain from using excessive force in the course of making arrests."  *Id.*  Since Ind. Code § 34-4-16.5-3(7) provides immunity "only when the plaintiff seeks recovery for the breach of a public duty, but provides no refuge to governmental entities or their employees for the breach of a private duty[,]" the use of excessive force is not conduct immunized by § 34-4-16.5-3(7).[12]

Nevertheless, since the *Kemezy* decision, the Supreme Court of Indiana in *Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind. 1999), expressly rejected the public duty/private duty test upon which the holding of *Kemezy* is based.  *See City of Anderson v. Davis*, 743 N.E.2d 359, 364 (Ind. Ct. App. 2001) (noting that the Indiana Supreme Court "rejected *Quakenbush's* distinction between 'private' and 'public' duties owed by government entities . . . .").  The *Benton* Court also reaffirmed the principle that "it is the legislature, and not the courts, that is in the best position to determine the nature and extent to which governmental units in Indiana should be insulated from tort liability."  *Benton*, 721 N.E.2d at 232.

Various courts have reached different conclusions regarding whether the Indiana Tort Claims Act applies to allegations of excessive force in the post-*Benton* era.  *Compare Davis*, 743 N.E.2d at 365 n.4;[13] *and Jordan v. City of Indianapolis*, No. IP 01-1391-C H/K, 2002 WL

---

[12]  This decision was based upon a prior provision of the governmental immunity statute (Ind. Code 34-4-16.5-3(7)), which for purposes here, is identical to the current statute (Ind. Code 34-13-3-3(8)).

[13]  The Court of Appeals of Indiana noted, "[T]he excessive force exception to ITCA immunity announced in *Kemezy* cannot be regarded as good law to the extent that it is based on the *Quakenbush* test.  The Act itself does not provide an explicit immunity exemption for

23

32067277, at *11 (S.D. Ind. Dec. 19, 2002) (granting immunity with respect to plaintiff's battery claims based on excessive force because, "[o]n the face of the statute, the only applicable exceptions to the granting of immunity are for false arrest and false imprisonment" ); *and Sellers v. Marion County Sheriff's Dep't*, No. IP 01-0474-C-M/S, 2002 WL 1630008, at *6 (S.D. Ind. June 27, 2002) (defendants are entitled to tort immunity for claims based on alleged use of excessive force) (citing *Davis*, 743 N.E.2d at 366 n.4) *with Phelps v. Hamer*, No. 1:02-CV-1912, 2004 WL 1146489, at *14 (S.D. Ind. May 10, 2004) (finding that, because the Indiana Supreme Court has not directly overruled *Kemezy*, plaintiff's state law claims of battery due to excessive force survive summary judgment despite the immunity statute); *and Estate of O'Bryan v. Town of Sellersburg,* No. 3:02-CV-238, 2004 WL 1234215, at *24 (S.D. Ind. May 20, 2004) (same).

Despite this conflicting authority, it is nevertheless clear on its face that Ind. Code § 34-13-3-3(8) only excludes claims of false arrest and false imprisonment from immunity.  In other words, Ind. Code § 34-13-3-3(8) protects governmental entities from claims based on excessive force.  As the *Benton* Court cautioned, the legislature, not the judiciary, "is in the best position to determine the nature and extent to which governmental units in Indiana should be insulated from tort liability." *Benton*, 721 N.E.2d at 232.  The language of the statute therefore tips the balance in favor of Defendants.  Accordingly, summary judgment is granted on Ramusack's state law claims of assault and battery.

---

excessive force or other illegal acts.  The only exceptions specifically recognized are false arrest and false imprisonment.  The interpretation of the ITCA to include a free standing illegality or excessive force exception, without any explicit support in the Act itself, would appear to run afoul of the supreme court's admonition in *Benton* that 'it is the legislature, and not the courts, that is in the best position to determine the nature and extent to which governmental units in Indiana should be insulated from tort liability." (citation omitted).

### III.  CONCLUSION

Defendants' Motion for Summary Judgment [Doc. 13] is **GRANTED IN PART** and

**DENIED IN PART**.  Defendants' Motion for Summary Judgment is **GRANTED** with respect

to the Section 1983 claims against Pete Land, City of Crown Point Chief of Police; the Crown

Point Police Department; and the City of Crown Point.  Defendant's Motion for Summary

Judgment is also **GRANTED** with respect to Plaintiff's unlawful arrest claim and the Section

1983 claims under the Sixth, Eight, and Fourteenth Amendments, to the extent Plaintiff is

bringing such claims.  Summary judgment is **GRANTED** on all state law claims.  Defendants'

Motion for Summary Judgment is **DENIED** on Plaintiff Ramusack's Section 1983 claim under

the Fourth Amendment against Defendant Swanson in his individual capacity.  This is the only

claim remaining in this suit.

Defendants have filed a Motion to Strike portions of Plaintiff's briefing relating to a

diagnosis of a torn rotator cuff.  As the Court has not relied upon Plaintiff's statements regarding

a torn rotator cuff, the Motion to Strike [Doc. 35-1] is **DENIED AS MOOT.**

**SO ORDERED**.

ENTERED: December 9, 2005

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT